No. 47,763

STATE OF KANSAS, *Appellee*, v. GARY D. TAYLOR, *Appellant.*

(538 P. 2d 1375)

Opinion filed July 17, 1975.

*James W. Wilson*, of Hodge, Wood and Wilson, of Wichita, argued the cause and was on the brief for the appellant.

*Robert Kennedy, Jr.*, assistant district attorney, argued the cause, and *Curt T. Schneider*, attorney general, and *Keith Sanborn*, district attorney, were on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: This is a direct appeal from the defendant's conviction by a jury of aggravated kidnapping.

On May 2, 1973, at approximately 4:00 p.m., Kimberly P. Whittle, a seven year old first grade student of Caldwell Elementary School in Wichita, was on her way home. As she walked down a sidewalk near the school a man got out of an old green pickup truck, blocked her path, picked her up around the waist, and placed her in the passenger's side of the truck.

While leaving the area the truck passed several members of the student safety-patrol; they saw the driver pushing Kimberly down in the seat. One alert young safety patrolman identified the truck as an old GMC and obtained the license number. This was reported to the principal who in turn relayed the information to the Wichita police. A license check revealed that the truck belonged to Gary Taylor, the defendant.

Events did not go so well for Kimberly. She began to cry, and her abductor took a small knife from his pocket, pressed it against her throat, and told her, "If you don't stop crying, I am going to skin you." She quit crying and told him to put the knife away, which he did. The man, who identified himself to her as "Gary," promised to show her some horses. They drove to a spot in rural Butler county along the rain-swollen Walnut River where he let her out of the truck. There, instead of showing her horses, he picked her up by the collar of her coat and the seat of her blue jeans, and on the count of three threw her into the water. Although she couldn't swim Kimberly was able to keep her head above water and scramble out of the river onto a little island or sand bar not far downstream. She attempted to hide but Gary found her, took her back to the initial launch point and threw her in again. This time the current carried her farther away and closer to the other side of the river where she was able to get out of the water and escape. She was found a short time later walking down a country road by Mrs. Velma Hall, who lived in the area. Mrs. Hall took her to the Hall home and dried her clothes. Mr. Hall arrived and called her parents and the police.

In response to the Halls' call Butler county deputy sheriff Wallace Parks went to the Hall house and talked to Kimberly about her experience. She described "Gary" as a young white man with shoulder-length hair and a small mustache, wearing blue jeans and an unbuttoned, multicolored shirt over a T-shirt. She also described the truck as an old one that "wasn't shiny," with a gear shift on the floorboard and a brown seat. .

At approximately 8:00 p. m. that same evening, at a truckstop near Augusta, a Butler county deputy sheriff found a truck matching the description and with the tag number of the one which had spirited Kimberly away. The defendant was inside the truckstop. He matched Kimberly's description and his identification proved him to be the owner of the truck. He was thereupon arrested.

Defendant's initial claim is that he was not brought before a magistrate without unnecessary delay as required by K. S. A. 22-2901. The record indicates that approximately one hour after defendant was arrested at the truckstop in Butler county, he was transferred to the Wichita police. He was held in their custody until approximately 2:00 p. m. on Friday, May 4, before he appeared before a magistrate in Wichita. During the intervening 42 hours from arrest to arraignment, defendant acquired counsel, appeared in a line-up where he was identified as the driver of the green truck by the young safety-patrolman from Caldwell School and as the "Gary" who threw her in the river by Kimberly, and was questioned by the police on at least two occasions.

This question is not a new one for this court. We have previously expressed our strong disapproval of unwarranted delay in taking a prisoner before a magistrate after arrest. However, we have consistently said that "delay is not in and of itself a denial of due process unless it has in some way prejudiced the accused's right to a fair trial." *State v. Giddings*, 216 Kan. 14, 17, 531 P. 2d 445; *State v. Nading*, 214 Kan. 249, 519 P. 2d 714; *Underwood v. State*, 214 Kan. 633, 522 P. 2d 457.

The burden to show prejudice by the delay is upon the defendant. The defendant here makes no attempt to assume this burden; *i. e.*, he makes no claim that anything happened during the 42 hour delay which might not as well have happened after presentment. He acquired counsel very early in this period. Instead, he attempts to shift the burden to the state, claiming that it is "ill placed since [he] is the least likely to be able to muster the resources to make [a] showing [of prejudice]." We disagree. The defendant is uniquely

positioned to know whether or not events took place which were unfairly prejudicial. He claims none, and our independent review of the record reveals none.

The defendant's next claims involve the search and seizure of his truck. It was seized at the time of defendant's arrest in Augusta, and was towed to the Augusta police department. There its doors were sealed, and it was later turned over to the Wichita police department. The truck was not searched by the officers in Augusta. After being taken to Wichita the truck was photographed, a warrant was obtained and the interior was searched. Nothing resulting from this search was offered in evidence during the trial. The state did attempt to introduce certain tools found in the bed of the truck but they were excluded because of their lack of relevancy. A piece of broken beer bottle found in plain view in the bed of the truck was received as being relevant because Kimberly stated that she had seen a whiskey or beer bottle in the truck and that the defendant smelled as if he had been drinking.

The United States Supreme Court recently dealt with an analogous situation in *Cardwell v. Lewis,* 417 U. S. 583, 41 L. Ed. 2d 325, 94 S. Ct. 2464. There the defendant was arrested on a murder charge. Evidence revealed that the murderer had used an automobile to push a car containing the victim's body over an embankment.

When arrested, defendant's car was located in a public parking lot. It was impounded by the police and towed to their impoundment lot but not searched until the following day. The court found no error in the seizure or in the delay in the search.

First the court there found that the evidence indicating "[a]n automobile similar in color and model to [this] car had been seen leaving the scene of the crime . . . corroborated by comparison of the paint scrapings taken from the victim's car with the color and paint of [the defendant's] automobile [and that he] had had repair work done on his car immediately following the death of the victim [constituted] reason to believe that the car was used in the commission of the crime for which [the defendant] was arrested." (*Id.* at 592.) This was, in the court's view, probable cause to search it.

In our case the police had an extremely accurate description of the make, model and color of the vehicle used in the kidnapping. In addition to this, they had the tag number and a detailed description of the driver. The truck found in the parking lot of the truck-

stop and the defendant inside met the description exactly. Under *Cardwell* this constituted probable cause to search the truck.

Defendant contends that even if probable cause did exist, there were no exigent circumstances requiring the seizure of the truck without a warrant. We disagree and cite *Cardwell* once again. There the defendant claimed that a warrantless seizure was not necessary because the police could have made their search in the parking lot where the car was located. The court rejected that argument noting that the car was parked in a "public place where access was not meaningfully restricted." In so doing the court distinguished *Coolidge v. New Hampshire,* 403 U. S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022, where a seizure of a car from the relative privacy of the defendant's driveway was held improper.

The *Cardwell* court quoted from *Chambers v. Maroney,* 399 U. S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975:

". . . For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

". . . The probable-cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained." (p. 52.)

Under the rationale of *Chambers* the court in *Cardwell* stated that the seizure of the car from a public parking lot instead of from a highway had "little, if any, legal significance. The same arguments and considerations of exigency, immobilization on the spot, and posting a guard obtain." (*Cardwell v. Lewis,* supra, pp. 594-5.)

The parallels here are obvious. The pickup truck was parked in a public parking lot with open access. The police had probable cause to believe that the vehicle had been used in the commission of a crime and contained valuable evidence relating to that crime. To preserve that evidence it was necessary that the truck be immobilized and protected so none of that evidence would be lost or destroyed. The seizure was clearly legal. See *State v. Hoy,* 199 Kan. 340, 430 P. 2d 275. If the police had probable cause to search the truck at the time it was discovered and defendant arrested, they

had probable cause to impound it and search it at a later, more convenient time.

The defendant also complains of the use at trial of photographs of his truck taken by the police department. The photographs were taken and used at the trial for identification purposes. The camera only preserved what the eye could readily see, and the eye can commit no trespass. *State v. Blood,* 190 Kan. 812, 378 P. 2d 548. We find no error in admitting these photographs.

Defendant's next claim of error relates to an interview conducted by two Wichita police detectives shortly before he was presented to a magistrate. He claims that after he retained counsel it was error to question him without his counsel being present. The question was answered in *State v. Melton,* 207 Kan. 700, 486 P. 2d 1361, where the defendant similarly claimed that no statement could be taken from him in the absence of counsel after he had been charged. We held there that an accused may waive the right to have his counsel present during police interrogation after, as well as before, formal charges are filed against him.

In this case, prior to any questions being asked the defendant was fully informed of his rights, including the right to have counsel present. He was asked about his whereabouts during the time the kidnapping took place. His comments were completely exculpatory except to put him in the general area of the crime where, of course, he was arrested. At one point during the conversation the defendant expressed his determination not to answer any more questions in the absence of his attorney. There is some discrepancy between the defendant's account of the questioning and the police officers' recollection as to just when he made this announcement. Defendant claims that it was before he said anything, and that he was induced to speak by the officers' statements that they were only after general information as to his whereabouts on the day of the crime. The officers' version of the conversation is that the defendant voluntarily waived his right to have counsel present and willingly answered several questions prior to revoking his waiver and exercising his right to remain silent. At that time, the detectives testify, their questioning immediately ceased.

A *Jackson v. Denno* hearing was conducted by the trial court. It found that the defendant had waived his right to have his lawyer present during the first portion of the interview and that his statements as to his whereabouts were voluntary and admissible. It also

found that the defendant reasserted his right to counsel during the interview and that all questions asked thereafter were inadmissible.

". . . In determining the admissibility of a statement of the defendant obtained during custodial interrogation the trial court must weigh any conflicting evidence and make its findings based on the totality of the circumstances. If there is substantial competent evidence to support the trial court's findings that the defendant voluntarily, knowingly and intelligently waived his Fifth and Sixth Amendment rights, such findings will not be disturbed on appellate review." (*State v. Soverns*, 215 Kan. 775, 777, 529 P. 2d 181.)

The trial court's findings here are adequately supported and will not be disturbed.

The final three allegations of error by the defendant relate to procedural matters occurring immediately prior to or during the trial.

First, the defendant claims that the trial court should not have allowed the state to endorse certain witnesses on the morning of the trial. Under K. S. A. 22-3201 (6) the question of endorsing witnesses is entrusted to the discretion of the trial court, and its ruling will not be disturbed unless abuse of that discretion is shown. The test is whether or not defendant's rights have been unfairly prejudiced. *State v. Williams & Reynolds*, 217 Kan. 400, 536 P. 2d 1395; *State v. Smith*, 215 Kan. 34, 523 P. 2d 691; *State v. Stafford*, 213 Kan. 152, 515 P. 2d 769. The defendant here alleges no surprise, nor does he allege that his trial strategy would have been different had he had earlier warning of the state's intent to call these additional witnesses. In fact the record indicates that these witnesses had been interviewed by defendant's counsel during the course of his investigation of the case and that he knew exactly what their testimony would be. There was no prejudice and no abuse of discretion by the trial court here in allowing the endorsement of the additional witnesses.

The defendant next complains that the testimony of two police officers who repeated Kimberly's story of her kidnapping was hearsay. The court ruled that the testimony in question was permissible under the exception to the hearsay rule covering "A statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness". (K. S. A. 60-460 [a].) At the time the officers testified Kimberly was in the court's library. When asked if he wanted her in the courtroom the defendant's

counsel replied, "No." She later testified. It would appear that the officers' testimony came squarely within the statutory exception.

Defendant now argues, however, that although physically present Kimberly was not mentally present and subject to cross-examination because she "was not able to recall at all times the transaction which occurred on May 2." We find this contention to be without merit. "Where a witness in fact testifies at a trial, it cannot be said that the witness was not 'available for cross-examination' under K. S. A. 60-460 (a)." *State v. Ralph,* 217 Kan. 457, 537 P. 2d 200, Syl. ¶ 3. Kimberly did "in fact" testify at the trial. She was carefully cross-examined by defendant's counsel. The questioning of counsel for both sides revealed that she could remember the events of May 2nd and that she had a clear recollection of what had happened to her. Our review of the record reveals that the only significant difficulty encountered centered around whether the seat of the truck was green or brown. Other than that, she described the truck, its broken window and torn seat and identified a picture of it as being the one driven by her abductor. She also recalled picking the defendant out of a line-up as being the one who threw her in the river, and she personally identified him again in the courtroom.

It is clear from the record that Kimberly was both physically and mentally present at the trial. The trial court did not err in admitting the officers' testimony.

The final claim of the defendant concerns the trial court's refusal to instruct on the lesser included offenses of simple kidnapping and unlawful restraint. The trial court ruled that the facts of this case indicated that the defendant was either guilty of aggravated kidnapping or not guilty of anything. The failure to instruct the jury on some lesser degree of a crime charged is not grounds for reversal if the evidence at the trial excludes a theory of guilt on a lesser offense. *State v. Harris,* 215 Kan. 961, 529 P. 2d 101 and cases cited therein.

Under K. S. A. 21-3421 the element distinguishing aggravated kidnapping from simple kidnapping is the presence of "bodily harm" to the victim. There is no evidence that Kimberly suffered any permanent injury from her ordeal. Therefore, if her kidnapping was "aggravated" kidnapping it must be because throwing her into the Walnut River was "bodily harm" as a matter of law. We believe it was.

"Bodily harm" has been defined by this court. In a kidnap-rape

case we held that "any touching of the victim against [the victim's] will, with physical force, in an intentional, hostile and aggravated manner, or the projecting of such force against the victim by the kidnaper is 'bodily harm' within the meaning of the statute." (*State v. Brown*, 181 Kan. 375, 389, 312 P. 2d 832.) The definition was derived from *People v. Tanner*, 3 C. 2d 279, 44 P. 2d 324. We have in subsequent cases followed *Brown* in holding that rape constitutes sufficient "bodily harm" to support a conviction of aggravated kidnapping. *State v. Ayers*, 198 Kan. 467, 426 P. 2d 21; *Sharp v. State*, 203 Kan. 937, 457 P. 2d 14, and *State v. Barry*, 216 Kan. 609, 533 P. 2d 1308. This construction has also been followed in California's *People v. Brown*, 29 C. 2d 555, 176 P. 2d 929 and *People v. Chessman*, 38 C. 2d 166, 238 P. 2d 1001.

The California court has significantly narrowed the definition of "bodily harm" set forth in *Tanner*, and followed by this court in *Brown*. That court now recognizes that some "trivial" injuries are likely to result from any forcible kidnapping by the very nature of the act. It concludes that insignificant bruises or impressions resulting from the act itself are not what the legislature had in mind when it made "bodily harm" the factor which subjects one kidnapper to a more severe penalty than another. A significant policy reason for making the distinction is to deter a kidnapper from inflicting harm upon his victim, and to encourage the victim's release unharmed. It was, in that court's view, only unnecessary acts of violence upon the victim, and those occurring after the initial abduction which the legislature was attempting to deter. Therefore, only injuries resulting from such acts would constitute "bodily harm." See *People v. Jackson*, 44 C. 2d 511, 282 P. 2d 898; *People v. Gilbert*, 63 C. 2d 690, 47 Cal. Rptr. 909, 408 P. 2d 365.

This refinement of the meaning of "bodily harm" fits within the limits of our own prior cases. The rapes in the *Brown, Ayers, Sharp* and *Barry* cases were acts of violence unnecessary to and not a part of the kidnapping itself. There was bodily harm or injury even though it may have been, at least in some of the cases, only temporary.

The act of throwing Kimberly into the Walnut River was an act of physical force committed in "an intentional, hostile and aggravated manner." (*State v. Brown*, supra.) It was unnecessary and outside the required scope of a forcible kidnapping; it was just the type of attack on the victim that our "aggravated" kidnapping statute was designed to deter. The river was swollen and fast;

Kimberly couldn't swim and was wearing a heavy corduroy coat. Only good fortune saved her from drowning. Throwing her in the river was a felony in itself; *i. e.*, it was an unlawful application of force to her person with an obvious intent to injure her, done in a manner whereby death could have been inflicted. It thus had all the elements of an aggravated battery under K. S. A. 21-3414.

While no permanent injury resulted, we think that in common understanding and in legal contemplation the ordeal inflicted on this child constituted "bodily harm." It follows that defendant was indeed guilty of aggravated kidnapping or of nothing, and the trial court was not required to instruct on any lesser included offenses.

The judgment is affirmed.

APPROVED BY THE COURT

FROMME, J., not participating.

PRAGER, J., dissenting: I respectfully dissent from syllabus ¶ 9 and the corresponding portions of the opinion. I would reverse because the trial court erred in denying defendant's request for an instruction on the lesser included offense of kidnapping and in failing to define "bodily harm." In my judgment the evidentiary record raises a factual issue as to whether or not "bodily harm" was inflicted upon the person kidnapped.

The key to a determination of this issue is the construction of the term "bodily harm" as used in K. S. A. 21-3421. The majority, in its construction of the term, relies upon numerous California cases which construe "bodily harm" to mean *injury* to the body of the kidnap victim. These cases have given rise to a California jury instruction in which "bodily harm" is defined to mean "substantial injury to the body of a person who was kidnapped by the application of physical force above and in addition to the force which is necessarily involved in the commission of such kidnapping." (CAL-JIC No. 9.23.) This instruction has been judicially approved. See *People v. Reed*, 270 Cal. App. 2d 37, 75 Cal. Rptr. 430.

Reliance upon the above language is well placed, for we have previously held the term "unharmed" to mean "uninjured." (*State v. Cox*, 188 Kan. 500, 363 P. 2d 528.) It would therefore logically follow that one who suffered bodily harm must be injured. But the majority does not reach this conclusion. The record does not conclusively establish that the victim here was injured. While it is apparent the defendant intended to inflict injury upon the victim, there

is no conclusive proof that injury occurred. The majority concludes defendant's actions alone were sufficient to constitute the infliction of bodily harm. The majority has thus determined the defendant was guilty of aggravated kidnapping or nothing. I cannot agree. The error in the reasoning of the majority is the assumption that an aggravated assault alone amounts to the infliction of bodily harm without regard to the result of the assault. Under 21-3421 *infliction* of bodily harm is a required element of aggravated kidnapping. This means that through the actions of the defendant, either directly or indirectly, the victim has suffered something more than a trivial injury. The record does not indicate that a substantial injury occurred here. In my opinion the refusal of the court to give the requested lesser included offense instruction and to define "bodily harm" constituted reversible error.