NOT DESIGNATED FOR PUBLICATION

No. 113,034

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHARLES E. MOSS, JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DAVID J. KAUFMAN, judge. Opinion filed July 15, 2016. Affirm in part, vacate the sentence, and remand for further proceedings.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., PIERRON, J., and JOHNSON, S.J.

*Per Curiam*:  Charles E. Moss, Jr., appeals from his convictions of and sentences for aggravated robbery and aggravated kidnapping. Moss claims the district court erred when it (1) denied his requests for jury instructions on certain lesser included offenses; (2) failed to recognize that the evidence of bodily harm was insufficient to sustain his conviction of aggravated kidnapping; (3) calculated his criminal history; and (4) gave the jury an instruction which compromised his ability to obtain jury nullification. We uphold Moss' convictions. We are not convinced, though, that the district court properly classified Moss' 2000 Lawton, Oklahoma municipal ordinance violation for domestic

1

abuse as a Kansas class B person misdemeanor and then converted it, with two other A or B misdemeanors, to score the aggregate as a prior person felony. We therefore vacate Moss' sentences and remand for resentencing under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Descamps v. United States*, 570 U.S. __, 133 S. Ct. 2276, 186 L. Ed. 2d 438 (2013), as applied in *State v. Dickey*, 301 Kan. 1018, 350 P.3d 1054 (2015).

FACTUAL AND PROCEDURAL BACKGROUND

Because of the nature of Moss' claims of instructional error, sufficiency of the evidence, and criminal history calculation, we recount the trial evidence and that from the sentencing hearing in considerable detail. The trial commenced July 17, 2014.

Jerry Douglas Muller, Jr., the victim of Moss' crimes, admitted in his testimony that he was a drug dealer, methamphetamine user, and felon twice convicted of theft. Muller said he and Warren Hallack became acquainted in November 2013. According to Muller, Hallack needed help finding a source of methamphetamine. Muller then vouched for Halleck with a drug supplier Muller identified "Mike."

Some short time later Mike informed Muller that Hallack owed Mike money. Muller said Mike looked to him to get Hallack to "cough up the money" or it would be Muller's responsibility to pay. Muller tried to reach Hallack by phone but failed. Muller knew that Hallack resided in a home owned by Charla Joetta Straws located directly behind the home where Straws lived with her husband and children. Muller went to Hallack's residence to discuss the debt, but Hallack was not there. Muller knew that Straws and Hallack were in a relationship, so Muller then went to Straws' house. Muller was not well received. Straws made a phone call and soon several people arrived. Straws and her companions then told Muller to leave and not come back. Muller left.

2

Approximately 1 week later, on December 26, 2013, Muller returned to Hallack's residence. Muller was not "expecting hostility" nor was he intending to take money from Hallack by force. Hallack was not home when Muller arrived, but the people there told him Hallack would be back soon and invited him inside. Those people left. Hallack then arrived, accompanied by Straws, Kisa Van Dyne, and a male he did not know. Muller testified that Hallack had a gun in his hand but was holding it down at his side. Although Hallack seemed aggravated by his presence, Muller did not consider his demeanor to be threatening or confrontational.

Muller told Hallack that he was "looking for the money." As Muller was speaking with Hallack the unknown male sprayed Muller in the face with Mace or pepper spray and "everything just kind of went to hell." The spray temporarily blinded Muller. Muller said he was struck repeatedly by, he assumed, Hallack, who was standing next to him yelling obscenities. Muller struck back, blindly, hitting someone. Hallack, Straws, and Van Dyne were all yelling and screaming. The unknown male had left. Muller heard Hallack say that he needed "Chuck" [Moss]. According to Muller, things only calmed down "once they had the gun in my face and I was on the floor." Hallack, pointing the gun at Muller, ordered him to stay on the floor and not move. Van Dyne obtained one or two butcher knives from Hallack's kitchen. Van Dyne held the knives "less than an inch" from Muller and acted as if she wanted to stab him. Muller said that Hallack was wrongly accusing him of stealing a laptop computer.

Hallack continued yelling at Straws and Van Dyne about Moss. Soon Moss arrived. Moss obtained the gun from Hallack, pointed it at Muller, and asked "You know who I am, boy?" Muller described what occurred next:

> "[Moss] asked what I was doing there. He asked who I was. He was telling [Hallack]
> to—that he needed some plastic. He needed something to tie me up with. While [Moss is]
> standing there and I'm kneeling on the floor, [Hallack]'s kind of circling us, going

3

through things, trying to find what [Moss] calls out for, piece of rope, twine, . . . Just get something to tie him up with. [Hallack] had left the room—left the house at that point, went out to the little shop that's in between the two houses and came back in with some zip ties. At that point [Moss] grabbed ahold of me and—away from the couch and threw me against—not threw me but shoved me against the wall and pushed me back down to the floor with the gun pressed against the back of my head."

When asked if he knew why Moss needed plastic, Muller said he thought that "they're gonna put plastic down on the floor, shoot me, and it was to capture blood."

Moss pulled Muller's shirt off and instructed him, at gunpoint, to remove his pants. Van Dyne removed several items from Muller's pockets, including his pocketknives, cell phone, and wallet. Moss took the necklace Muller was wearing and placed it around his own neck. Moss and Hallack forced Muller to put his hands behind his back. They then placed zip ties around his wrists and a pillowcase over his head, which they secured by wrapping a cord snuggly around his neck. Moss asked Muller "how scared [he] was, and was [he] scared to die, and . . . what way of dying scared [him] the most." Moss commented about those ways to die, listing "being buried alive . . . shot in the head or shot in the chest." Additionally, Muller overheard the others discussing whether to kill him. Muller heard Straws indicate that she wanted him dead.

Muller assumed that Moss had moved away from him because he no longer heard his voice, but Van Dyne remained nearby. Muller said he attempted to stay calm but his shoulder, injured in the earlier fight, twitched involuntarily several times. Each time this occurred, Van Dyne hit him in the back of the head. Eventually, Moss returned, pulled Muller to his feet, took him across the living room, and led him outside. Muller said he was then pushed into the trunk of a car which was lined with plastic. Muller heard the trunk lid close, two car doors shut, and felt the car begin to move.

As the car was traveling, Muller was able to free his left hand from the zip ties. He then removed the bag from his head. He found his clothes and dressed himself. He eventually found a tire iron which he used to force the trunk lid open. Muller then jumped out of the trunk. As he did so he saw that Hallack was driving and Moss was in the passenger seat. Muller said he had marks on his wrists where the zip ties chafed his skin. He also had knots and bruising on the back of his head.

Ian Blade Bentley testified that, as he was driving home, he noticed a car with two occupants drive by with its trunk open. Bentley observed something out of the corner of his eye but could not say he actually saw anyone leave the trunk. Immediately thereafter, Muller, who was holding a tire iron and had zip ties around his left wrist, flagged Bentley down. According to Bentley, Muller told him that he had been kidnapped and had just escaped from the trunk of a car. Bentley was reluctant to help but he did flag down a passing UPS truck whose driver, after hearing Muller's story, called police.

Officers arrived 20 to 30 minutes later. Muller told Officer David L. Goodman what had happened and provided general directions to Straws' house. As Officer Goodman drove Muller there, Muller noticed Straws standing at a street corner. Officer Goodman alerted other officers, who then detained Straws. Officer Goodman and Muller continued on to Straws' house. Once there, Muller identified the car from which he had escaped. Both Officer Goodman and the crime scene investigating officer testified that the car's trunk appeared to have been pried open from the inside.

Officer Goodman learned that another officer had located and detained a black male and a white female who were walking north from Straws' property. Officers were alerted to these individuals by Eliza Lee Jones, a neighbor of Straws. Because the individuals matched Muller's description of two of his attackers, Officer Goodman drove Muller to the suspects' location. Once there, Muller identified the two as Moss and Van

5

Dyne. Moss had two knives in his possession and was wearing a necklace. Muller subsequently advised officers that the necklace and one of the knives belonged to him.

At the conclusion of the police investigation, the State charged Moss, Hallack, Van Dyne, and Straws with one count each of aggravated robbery and aggravated kidnapping. Pursuant to a plea agreement, Straws pled guilty to aggravated robbery and kidnapping in exchange for an agreed sentence of 3 years' probation. Under the terms of her plea agreement, Straws agreed to "testify and tell the truth in the proceedings against [her] codefendants."

Straws did testify at Moss' trial. She stated that on the morning of December 26, 2013, Van Dyne barged into her residence, saying that Hallack had sent her because Muller was back. Straws then explained that she was "not a fan of [Muller]," whom she met previously when he brought Hallack home. Muller's presence angered and frightened Straws. According to Straws, she had informed Muller he was not welcome on her property because he had made unwanted sexual advances towards her in the past and she did not want him around. Additionally, Straws claimed that Muller had tried to kidnap a mutual friend's girlfriend, he was known for "raping young ladies," and Straws knew that he earned a living by selling drugs and stealing cars.

Straws and Van Dyne ran over to Hallack's residence. Once inside, Straws encountered Hallack and Muller. According to Straws, Hallack was angry because his laptop was missing. While Straws did not see any weapons or hear any threats, she said Hallack was yelling as he accused Muller of taking a laptop. Straws searched for and found the laptop in a backpack on the porch.

Straws and Hallack accused Muller of attempting to steal from them. Muller repeatedly said that he "didn't do it." Straws then called Muller "a boldfaced liar." Muller told Straws how much he respected her. Straws acknowledged that she told him to "shut

6

up" and stop talking to her because he was making her mad. Straws admitted that she was "ready to slice his throat."

Straws said that Moss called Hallack during the confrontation. When Hallack informed him of the happenings with Muller, Moss insisted on coming over. Consequently, Straws and her husband picked up Moss and his girlfriend and brought them to Hallack's place. Straws said she then saw Moss walking around with a gun behind his back, while Muller was on his knees facing the wall. Straws claimed she never actually saw Moss point the gun at Muller, but admitted Muller likely saw it.

According to Straws, once she was back inside Hallack's residence, she began "bouncing around like a feather in a tornado" checking for other missing items. Because they were positive that Muller was stealing from them, Moss told Muller to empty his pockets. Although Muller complied, they believed he held items back, so Moss then ordered Muller to undress. Straws said Muller did not have a wallet or a cell phone on his person, but he did have some gold jewelry Van Dyne claimed was hers. He also had Hallack's knife and Zippo lighter, and keys Straws said Muller used to steal cars. Muller was also wearing a necklace. According to Straws, Van Dyne ordered him to remove the necklace. Van Dyne claimed it belonged to her, but Muller maintained that his brother had given him the necklace. Straws told Hallack that she thought she remembered seeing the necklace on Muller the first time she met him. Eventually, though, Muller gave in to Van Dyne's demand and gave her the necklace.

Straws testified that Moss, in a nonthreatening manner, told Muller to get on his knees. Moss then asked Hallack and Straws to step upstairs. The three of them discussed what to do with Muller. Straws admitted that she angrily told Hallack that she "wanted to kill" Muller, but she also testified that she and Hallack were actually against killing him. The three ultimately decided that Muller "needed to be taught a lesson" and, thus, Muller was going to "be taken for a ride and made to walk back into town" in the cold. They

7

further determined that they should also make Muller believe that they were going to kill him, so he would be "scared good enough" to stay away from Straws, her family, and her property. Although Straws did not necessarily agree with this tactic, she did express her fear that scaring Muller would not be enough to keep him away. Hallack responded that they would call police if Muller returned. During this conversation, Van Dyne stayed in the living room with Muller.

Once Straws returned to the living room, Moss was talking to Muller. Although Moss' demeanor was "pretty relaxed" and he was holding the gun between his knees, he was questioning Muller about the "worst way to die." Straws said this disturbed her, so she pulled Hallack upstairs to further discuss Muller's fate:

> "[Hallack] said, We're not gonna kill him, and I said, Well, what's being said is what's his worst way to die, and back where I come from when they trunk somebody they kill him. I says, This is kind of scaring me a little bit. And he said, Well, what do you want, baby? And I said, Well, I want him dead, but—and [Hallack] said, But we're not gonna kill him. And I said, No, we're not gonna kill him. I said, I'm mad enough that I want him dead, but I don't want us to do it."

Following this discussion, Straws returned downstairs and discovered that Muller's hands were fastened behind his back and he had a pillowcase over his head. Straws was not surprised by the pillowcase, as she had told Moss where he could find something to cover Muller's face. Moss told the group that the trunk of Hallack's car needed to be cleaned out. Straws also recalled a conversation about finding some plastic "to put down in the trunk."

Van Dyne and Moss' girlfriend volunteered to clean out the trunk. Straws said she retreated to her craft room, where she sat in a rocking chair with her head in her hands. After some time had passed, Van Dyne and Moss reentered the residence. Van Dyne was shaking her hand and complaining that it hurt. Straws asked her what was wrong.

According to Straws, Van Dyne replied, "I punched [Muller] in the back of the head when [Moss] and I put him in the trunk." Subsequently, while Straws, Van Dyne, and Moss were chatting inside Straws' craft room, Straws received a phone call from Hallack. During this call, Hallack stated, "You forgot to take the pry bar out of the trunk, baby." Halleck informed Straws that Muller had escaped.

Police witnesses testified that Moss was wearing, at the time of his arrest, the silver necklace Muller said Moss has taken from him at gunpoint.

Moss did not testify. He called as his only witness a DNA expert from the Kansas Bureau of Investigation who has tested a handgun found in a search of Straws' residence. The expert had found some DNA on the weapon, but testing excluded Moss as the source of the DNA. The expert also said the results excluded Hallack as a major contributor although they were inconclusive on whether he was a minor contributor.

During the instruction conference the district court, without objection, proposed to instruct the jury on aiding and abetting. Also, without objection, it proposed to give the standard closing instruction on the duty of the jury now at PIK Crim. 4th 68.010. Moss requested instructions on kidnapping and criminal restraint as lesser included offenses under the aggravated kidnapping charge. He also requested an instruction on robbery as a lesser included offense under the aggravated robbery charge. The district court agreed to instruct on kidnapping. It denied any further lesser included offense instructions finding that they were not factually appropriate under the evidence.

On July 18, 2014, the jury found Moss guilty as charged of aggravated kidnapping and aggravated robbery. Subsequently, after a hearing, the district court denied Moss' motion for a new trial. Sentencing was set over to a new date because Moss challenged the criminal history score as calculated in the presentence investigation (PSI).

On October 30, 2014, the district court conducted the sentencing hearing. Moss objected to the classification of his 2000 Lawton, Oklahoma, municipal court conviction of domestic abuse. The PSI report treated the conviction as a class A or class B person misdemeanor, aggregated it with two subsequent class A or class B person misdemeanors, and converted the three offenses to a person felony conviction. The criminal history score difference was significant: if the misdemeanors were properly converted, Moss' criminal history score was C; if not, Moss' criminal history score was E.

The State provided the Lawton ordinance on domestic abuse and the journal entry of conviction. Moss argued that the Lawton ordinance he had violated criminalized not just a domestic battery, an offense amenable to conversion, but also a domestic assault, which was not an appropriate offense to justify conversion. The district court recognized that Moss' position implicated the "the categorical approach and the limited use of the modified categorical approach" analyzed in *Descamps v. United States*, 570 U.S. __, 133 S. Ct. 2276, 186 L. Ed. 2d 438 (2013). Nevertheless, the district court declined to address any *Descamps* argument, indicating that it could be raised on appeal. The district court ruled that the Oklahoma misdemeanor offense was comparable to a Kansas class B domestic battery misdemeanor, that it could be converted with the other two misdemeanors to a person felony, and that Moss' criminal history score was C. The district court sentenced Moss to prison for a total term of 313 months. Moss timely appeals his convictions and sentences.

10

We consider the points Moss has raised in his appeal in the order he briefed them.

*Moss was not entitled to additional lesser included offense instructions.*

Moss contends that the district court committed reversible error when it refused to instruct the jury on the lesser included offenses of criminal restraint, under the aggravated kidnapping charge, and robbery, under the aggravated robbery charge. When the giving of or failure to give a lesser included offense instruction is challenged on appeal, appellate courts apply the analytical framework for jury instruction issues. See *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012). Issues are reviewed in accordance with the following four-step analysis and corresponding standards of review:

> "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).' [Citation omitted.]" *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015).

In this case, Moss properly preserved these issues for review, as he specifically requested instructions on criminal restraint and robbery. And, as the parties and district court correctly acknowledged below, each lesser included offense instruction Moss requested was legally appropriate. See *State v. Ramirez*, 299 Kan. 224, Syl. ¶ 3, 328 P.3d 1075 (2014) ("The crime of criminal restraint constitutes a lesser degree of the crime of kidnapping, and, therefore, criminal restraint is a lesser included crime of kidnapping.");

11

*State v. Simmons*, 282 Kan. 728, 742, 148 P.3d 525 (2006) ("[R]obbery and certain types of theft have been deemed to be lesser included offenses of aggravated robbery.").

The determinative issue, then, is whether the instructions requested were factually appropriate under the third step of the *Woods* analysis. "Even if an instruction is legally appropriate, the instruction is only required when *'"there is some evidence* which would reasonably justify a conviction of [the lesser included offense.]"'" (Emphasis added.) *State v. Brown*, 300 Kan. 565, 585, 331 P.3d 797 (2014) (quoting *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 [2012] [quoting K.S.A. 22-3414(3)])." Put another way, an instruction on a lesser included offense is not required if the jury could not reasonably convict the defendant of the lesser offense based on the evidence presented. *State v. Robinson*, 261 Kan. 865, 883, 934 P.2d 38 (1997). Thus, a defendant is only entitled to an instruction on a lesser included offense if: "(1) the evidence, when viewed in the light most favorable to the defendant's theory, would justify a jury verdict in accord with the defendant's theory and (2) the evidence at trial does not exclude a theory of guilt on the lesser offense." *State v. Williams*, 268 Kan. 1, Syl. ¶ 5, 988 P.2d 722 (1999).

*Criminal Restraint*

The State charged Moss with aggravated kidnapping under K.S.A. 2015 Supp. 21-5408(a)(3), (b). Under the definition relevant here, kidnapping is "the taking or confining of any person, accomplished by force, . . . with the intent to hold such person: . . . to inflict bodily injury or to terrorize the victim." K.S.A. 2015 Supp. 21-5408(a)(3). The crime becomes aggravated if "bodily harm is inflicted upon the person kidnapped." K.S.A. 2015 Supp. 21-5408(b). Criminal restraint, on the other hand, is "knowingly and without legal authority restraining another person so as to interfere substantially with such person's liberty." K.S.A. 2015 Supp. 21-5411(a).

12

Moss contends that there is support for his position in the analytical principles recognized and applied by our Supreme Court in *State v. Haberlein*, 296 Kan. 195, 290 P.3d 640 (2012), *cert. denied* 134 S. Ct. 148 (2013), and *State v. Soto*, 301 Kan. 969, 349 P.3d 1256 (2015). In *Haberlein*, the defendant was charged with first-degree premeditated murder. Haberlein did not request an instruction on second-degree murder. He was convicted as charged. On appeal, for the first time, he argued that the district court erred when it failed to give a second-degree murder instruction. Our Supreme Court concluded:

> "While the evidence of premeditation in this case was extremely strong, there was also at least some evidence of each of the other elements of first-degree premeditated murder, and these elements are identical to the elements of second-degree intentional murder. Thus, at least in theory, the jury could have chosen to convict Haberlein of second-degree intentional murder without having its verdict subject to reversal for insufficient evidence. This means the instruction was factually supported." *Haberlein*, 296 Kan. at 204.

Nevertheless, the Supreme Court determined that the error was harmless.

Similarly, in *Soto*, the defendant, convicted of first-degree murder, argued trial error in that the district court did not *sua sponte* give a second-degree lesser included offense instruction. Again, the Supreme Court agreed the failure was error, although, again, harmless. The Supreme Court discounted the State's concern that *Haberlein* read out of existence the need that there be "some evidence" that the lesser included offense had been committed. The court pointed to facts in evidence at the *Soto* and *Haberlein* trials on which a jury could find that the murders were not premeditated. Contrary to Moss' contention, the cases do not stand for the proposition that a trial court must give all possible lesser included offense instructions without the traditional, and statutory, requirement that there must be some evidence that would reasonably justify a lesser offense conviction. See K.S.A. 2015 Supp. 22-3414(3).

13

Moss then attempts to accommodate the "some evidence" requirement by contending there was such evidence of criminal restraint. Rather than paraphrase Moss' argument, we will quote it:

"Additionally, the court explained the crux of the State's case relied on the testimony of Muller and of Charla Straws, a co-defendant in the case. However, even without their testimony, there was evidence Muller jumped out of the trunk of Warren Hallack's car and had zip ties around his wrists when he did so. As such, there was some evidence of the element of restraint that substantially interfered with Muller's liberty. The jury could have, in theory, chosen to convict of criminal restraint alone, even if [it] found Muller and Straws lacked credibility. If the jury chose to convict Mr. Moss for criminal restraint, this verdict likely would not be reversed for insufficient evidence. See *Haberlein*, 295 Kan. at 204. As such, the criminal restraint instruction was factually supported."

We reject Moss' contention that he could have reasonably been convicted of criminal restraint. How could Moss be convicted of anything based solely on Bentley's testimony that he saw a car go by with its trunk open and a person wearing zip ties on his wrist at that location who could have left the trunk? Bentley did not identify either Moss or Hallack as occupants of the car. Bentley gave no testimony as to why Muller was in the trunk or why he might have forced it open and jumped out. Moss' speculation about what the jury could have believed based only on Bentley's testimony is just that, *i.e.*, speculation, not some evidence. Again, in *Soto* and *Haberlein*, there was some factual evidence that reasonably cut against premeditation.

Even when viewed in a light most favorable to Moss, the jury could not have reasonably convicted him of criminal restraint. If Muller and Straws are to be believed at all, Moss and/or his codefendants did far more than just knowingly and without legal authority restrain Muller and interfere with his liberty. Rather, they bound Muller, discussed his death, loaded him into the trunk, were transporting him to a remote

14

location, and inflicted bodily harm (knots and bruises) on his head. Indeed, Muller testified that Moss pressed a gun against his head, bound his hands behind his back, placed a pillowcase over his head, antagonized him with comments regarding the worst way to die, threw him in the plastic-lined trunk of a car, which drove away. Even Straws was afraid that Hallack and Moss intended to kill Muller. And, again, Muller claimed that at the end of his encounter with Moss, Hallack, Van Dyne, and Straws, he had knots and bruising on the back of his head.

Likewise, although Straws recounted the events that occurred on December 26, 2013, in a manner different from Muller, Straws' account further supports the notion that Moss, either as a principal or an accomplice, took actions beyond merely restraining Muller. Straws testified that she saw Moss with a gun on more than one occasion. She confirmed that, following the discussion regarding what to do with Muller, Moss questioned Muller about his vision of the "worst way to die" while holding the gun between his knees. Straws acknowledged that after Muller's hands were fastened behind his back and a pillowcase was placed over his head, someone placed him in the trunk of Hallack's car. Moreover, according to Straws, Van Dyne told her that she "punched [Muller] in the back of the head when [she and Moss] put him in the trunk," and the blow was substantial enough to cause Van Dyne to experience pain in her hand.

Accordingly, based upon the evidence, the district court was correct when it found that this case "comes down to . . . either a kidnapping, agg[ravated] kidnapping, or nothing" because the evidence did not reasonably support a finding that Moss merely committed criminal restraint. The jury could accept none, or some, or all of the evidence from the trial, but the district court was not required to instruct it on evidence that had not been adduced. We have reached similar decisions on comparable facts in other cases. See *e.g.*, *State v. Little*, 26 Kan. App. 2d 713, 717-18, 994 P.2d 645 (1999), *rev. denied* 269 Kan. 938 (2000); *State v. McCoy*, No. 110,827, 2015 WL 3632037, at *14-15 (Kan. App. 2015) (unpublished opinion), *rev. denied* 304 Kan. __ (April 21, 2016).

15

In *Little*, our court explained:

"Had the defendant merely ordered the [victims] to separate rooms and told them to stay there, there might have been some question that an instruction on criminal restraint would have been required. However, under the circumstances in this case, the binding of the victim [with duct tape] was clearly done in order to facilitate the crime of robbery, and the defendant could not have been reasonably convicted of criminal restraint." 26 Kan. App. 2d at 718.

We need not analyze those decisions, although we agree with them. It is enough to confirm that a defendant is only entitled to a lesser included offense instruction when some evidence, even if it is weak, would reasonably justify a conviction of that lesser offense. Here, the evidence excluded a theory of guilt based merely on criminal restraint. *Williams*, 268 Kan. 1, Syl. ¶ 5. Moss could not have reasonably been convicted of criminal restraint, as the trial evidence was that he possessed a gun, stripped, bound and hooded Muller, asked him to consider the worst way to die, loaded him in a trunk lined with plastic, and during which incident Muller sustained bodily harm. The district court did not err when it refused to instruct on criminal restraint.

*Robbery*

The State charged Moss with aggravated robbery under K.S.A. 2015 Supp. 21-5420(b)(1), which defines the offense as a robbery "committed by a person who . . . [i]s armed with a dangerous weapon." Relevant to this appeal, robbery is defined as "knowingly taking property from [another] person . . . by threat of bodily harm to [that] person." K.S.A. 2015 Supp. 21-5420(a).

Moss' argument regarding the appropriateness of providing the jury with an instruction on robbery is very similar to the one he raises in support of a criminal restraint instruction. In particular, Moss claims that a robbery instruction was factually

16

appropriate. He again argues, based on his reading of *Soto* and *Haberlein*, that because "[t]he same evidence that would support aggravated robbery would also support a simple robbery conviction[, citations omitted, as] [t]he only distinguishing factor . . . is a dangerous weapon." Then he suggests that the jury could have chosen to "'discredit all of the evidence in the case relating to guns and knives.'" As explained above, Moss' attempt to rely only upon the similarity of the elements of aggravated robbery and robbery is without merit. See *Soto*, 301 Kan. at 987-88. Consequently, the issue is actually whether there was some evidence admitted at Moss' trial which would reasonably justify a conviction for robbery. The answer must be that there was none.

Moss does not point to any evidence in the record that casts doubt on the presence of a dangerous weapon. He again hangs his hat upon his hypothesized claim that the jury could have chosen to "'discredit all of the evidence in the case relating to guns and knives.'" As the State asserts, this argument does not advance Moss' cause. In *State v. Grant*, No. 110,626, 2015 WL 2414278, at *8-9 (Kan. App. 2015) (unpublished opinion), *petition for rev.* filed June 15, 2015, the defendant contended that a lesser-included offense instruction was appropriate because "evidence supporting an aggravated robbery conviction also supports a robbery conviction." A panel of this court rejected this analysis as overly simplistic because it overlooked the rule that a lesser-included offense instruction is not appropriate if the trial evidence excludes guilt on that lesser offense, and all of the witnesses agreed that the victim was robbed at gunpoint. 2015 WL 2414278, at *8-9. See *State v. Sutherland*, 248 Kan. 96, 103, 804 P.2d 970 (1991) ("There is no evidence upon which the jury could have found Sutherland guilty of robbery rather than aggravated robbery. There was no question for the jury other than Sutherland's presence.").

Likewise, in *State v. Mitchell*, 234 Kan. 185, 189-90, 672 P.2d 1 (1983), our Supreme Court held:

17

"It is not contested in this case that the robber had a gun. Every witness who was in the bar at the time of the robbery testified that the robber had a gun. This is not a case where the defendant admitted the crime but claimed not to have used a weapon. The question the jury was asked to decide was whether appellant was the robber, not whether a weapon was used."

And in *State v. Johnson & Underwood*, 230 Kan. 309, 311, 634 P.2d 1095 (1981), the Supreme Court noted that "[i]n the present case the evidence is uncontroverted: the robbery was accomplished with a gun. . . . Defendants were guilty of aggravated robbery or nothing."

Like *Grant*, the evidence in this case excludes guilt on the lesser offense of robbery. Muller testified that after Moss pulled Muller's shirt off, instructed Muller at gunpoint to remove his pants, and told Muller "not to [expletive deleted] move," Van Dyne took several items from Muller's pockets and Moss stole Muller's necklace. Straws described a similar scene: Moss instructed Muller to empty his pockets, and because they doubted that Muller had fully complied with this request, Moss then ordered Muller to undress. Moreover, although Straws did not specifically mention the gun while she described the taking of Muller's property, she acknowledged that Moss had a gun during the incident. She just did not see him point it at Muller.

Moss argues that the DNA evidence found on the gun was not his DNA. Thus, he concludes that, without physical evidence that he held the gun, the circumstances dictate that the court assume that no gun was used during the robbery. This court recently rejected an inherently similar argument in *State v. Hadrin*, No. 112,736, 2016 WL 197775, at *4-5 (Kan. App. 2016) (unpublished opinion), *petition for rev.* filed February 15, 2016. In *Hadrin*, the district court failed to give a lesser included offense instruction on robbery, and on appeal, Hadrin insisted, among other arguments, that district courts must instruct on robbery if no weapon was later found. 2016 WL 197775, at *4-5. A

18

panel of our court disagreed, finding that such "nonevidence" did not compel a lesser-included instruction. 2016 WL 197775, at *5.

Here, there was no evidence upon which the jury could have found Moss guilty of robbery. Given the testimony of Muller and Straws, the jury could not have reasonably found that Moss did not have a deadly weapon when he, or Van Dyne, took Muller's necklace. Consequently, the district court did not err when it refused to instruct the jury on robbery because the evidence only left one question for the jury to decide, *i.e.*, whether Moss committed the charged crime.

*The evidence was sufficient for the jury to find that Muller suffered "bodily harm" during his kidnapping.*

After the State rested its case, Moss moved for a directed verdict of acquittal on the ground that the State had failed to meet its burden of proof. Concerning the aggravated kidnapping charge, Moss contended that the State's evidence did not support the "bodily harm" element of that crime. The district court disagreed, finding the State presented sufficient evidence for the bodily harm element of aggravated kidnapping to be decided by the jury. The district court determined that the jury had evidence that Van Dyne struck Muller several times after his wrists had been bound and the pillowcase placed over his head and Muller suffered bodily harm greater than trivial, in the form of several knots on the back of his head.

On appeal Moss again contends that the State presented insufficient evidence to support his conviction for aggravated kidnapping. He argues that Muller's injuries were minor and trivial and such injuries cannot satisfy the bodily harm element of aggravated kidnapping. When the sufficiency of the evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the prosecution. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014). The conviction will be

19

upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. In determining whether there is sufficient evidence to support a conviction, the appellate court generally will not reweigh the evidence or the credibility of witnesses. 299 Kan. at 525.

The district court provided the jury an instruction that contained the following definition of bodily harm:

> "Bodily harm means any touching of the victim against the victim's will, with physical force, in an intentional, hostile, and aggravated manner, or the projecting of such force against the victim by the kidnapper. Only unnecessary acts of violence upon the victim, and those occurring after the initial abduction, which result in injuries to the victim constitute bodily harm. Trivial injuries and insignificant bruises or impressions resulting from the abduction itself do not constitute bodily harm."

The Kansas Supreme Court developed this definition in *State v. Taylor*, 217 Kan. 706, 713-15, 538 P.2d 1375 (1975), from a California case. In *Taylor*, the defendant threw the 7-year-old kidnapping victim into a rain-swollen river that was flowing fast. "Only good fortune saved her from drowning," as she could not swim and was wearing a heavy corduroy coat. 217 Kan. at 714-15. Because the child did not suffer any permanent injuries from her ordeal, Taylor argued that the district court should have instructed the jury on the lesser included offenses of simple kidnapping and unlawful restraint. Our Supreme Court disagreed because it found that the defendant was guilty of aggravated kidnapping or of nothing because the child suffered bodily harm, as a matter of law, when the defendant threw her in the river. 217 Kan. at 713-15. According to the court, the act of throwing the child in the river satisfied the bodily harm element of aggravated kidnapping because it was an act of physical force committed in an intentional, hostile, and aggravated manner; it was unnecessary and outside the required scope of a forcible kidnapping; it was "just the type of attack on the victim that our 'aggravated' kidnapping statute was designed to deter"; and it was a felony itself because it was "an unlawful

20

application of force to her person with an obvious intent to injure her, done in a manner whereby death could have been inflicted." 217 Kan. at 714-15.

As noted by a panel of this court in *Crowther v. State*, 45 Kan. App. 2d 559, 573, 249 P.3d 1214, *rev. denied* 293 Kan. 1105 (2011), Kansas courts have consistently defined bodily harm in the manner set forth in *Taylor*. See *State v. Royal*, 234 Kan. 218, 222-24, 670 P.2d 1337 (1983) (victim suffered small knife gouge on her collar bone and small cut on her hand from knife used by defendant in perpetrating offense, and although the wounds were not life-threatening, court did not regard them as trivial or as likely to result from any forcible kidnapping); *State v. Sanders*, 225 Kan. 156, 157-59, 587 P.2d 906 (1978) (evidence sufficient to satisfy bodily harm element of aggravated kidnapping because defendant threw victim [a baby] a distance of 25 to 30 feet and baby suffered a split lip and a scratch on his back).

Moss relies on *State v. Riley*, No. 106,353, 2012 WL 4373002 (Kan. App. 2012) (unpublished opinion), *rev. denied* 297 Kan. 1254 (2013). There the jury found Riley guilty of aggravated robbery. Riley was not accused of using a dangerous weapon. Thus, the only way his robbery could be elevated to aggravated robbery was for the State to prove that he had inflicted bodily harm on the person he robbed. Riley maintained that there was no evidence of such bodily harm adduced at trial. The *Riley* panel agreed. The victim there testified that the robber jumped over the counter to reach the cash register and grabbed her jacket. The two struggled over the money until Riley threatened to knock the victim out and shoot her 6-year-old daughter who was in the back room of the store. The victim then shoved the money at Riley and told him to leave. The *Riley* panel held that there was no evidence that the victim suffered any bodily harm at all and reversed Riley's conviction. 2012 WL 4373002, at *8-9. The facts here are clearly distinguishable from those in *Riley*. Muller had knots and bruises on the back of his head.

21

We note that in *State v. Peltier*, 249 Kan. 415, 819 P.2d 628 (1991), *cert. denied* 505 U.S. 1207 (1992), our Supreme Court indicated that if the existence of bodily harm was disputed, the jury instruction on aggravated kidnapping should include the definition of bodily harm. The district court gave that definition here, and Moss does not complain about the accuracy or completeness of the district court's definition. Clearly the *Peltier* court was aware that the existence of bodily harm could be contested, but it impliedly recognized that such an issue should be resolved by a properly instructed jury.

We agree with the district court that the existence of bodily harm was an issue for the jury. This was not a case like *Riley* where the record contained no evidence of bodily harm and, thus, as a matter of law, the proof on that element failed. The evidence of bodily harm to Muller was sufficient to submit to the jury. The existence of bodily harm was an element the State was then required to prove to a properly instructed jury beyond a reasonable doubt. Muller testified that after he was bound and had a pillowcase placed over his head, Van Dyne hit him in the back of the head with her fist several times just because his shoulder involuntarily twitched. The blows were so hard that they caused knots on the back of his head. Straws' testimony corroborated the intensity of the blows, although not the timing: Straws testified that Van Dyne told her that she "punched [Muller] in the back of the head when [she and Moss] put him in the trunk." According to Straws, Van Dyne was shaking her hand and complaining that it hurt. The blows Muller sustained to his head were unnecessary acts of violence done in an intentional, hostile, and aggravated manner after his initial binding and blinding. While Muller did not require medical attention and he did not sustain any permanent injuries, knots and bruising to the back of the head gratuitously and angrily inflicted are not, as a matter of law, trivial or insignificant in nature. Such injuries can constitute bodily harm under the aggravated kidnapping statute.

We view challenges to the sufficiency of the evidence in the light most favorable to the prosecution. In that light we conclude that there was substantial competent

22

evidence upon which a rational factfinder could have found Moss guilty of aggravated kidnapping under the aiding and abetting responsibility he bore for Van Dyne's gratuitous infliction on Muller of bodily harm.

*The district court erred when it treated Moss' Oklahoma misdemeanor conviction as a convertible offense.*

Moss' PSI report calculated his criminal history score as a C due, in part, to the aggregation of three of his prior misdemeanor convictions, including an Oklahoma municipal court conviction from 2000 for domestic abuse, into one person felony pursuant to K.S.A. 2015 Supp. 21-6811(a). Moss challenged that score, arguing that the State had failed to prove that the Oklahoma conviction could lawfully be aggregated and converted because the ordinance proscribed several types of conduct, not all of which conduct constituted a convertible offense.

After considering the arguments, the statutes, and the documents from Oklahoma, the district court determined that the Oklahoma offense was comparable to a Kansas B misdemeanor domestic battery. The court permitted the conversion of the Oklahoma offense aggregated with two A or B misdemeanors (the existence of which Moss did not challenge) to a prior person felony for criminal history score purposes. Interestingly, the district court noted that Moss' argument implicated the United States Supreme Court's holding in *Descamps*, the importance of which had not yet been explained by our Supreme Court at the time of Moss' sentencing. Perhaps the district court was acquainted with this court's *Descamps* analysis in *State v. Dickey*, 50 Kan. App. 2d 468, 484, 329 P.3d 1230 (2014) (*Dickey I*), which was published on June 27, 2014, some months prior to Moss' sentencing [which analysis was subsequently approved by our Supreme Court in *State v. Dickey*, 301 Kan. 1018, 350 P.3d 1054 (2015) (*Dickey II*)]. Nevertheless the district court declined to conduct a *Descamps* analysis and indicated that such an issue could be dealt with on appeal.

23

On appeal, Moss renews his challenge to the district court's classification of his 2000 Oklahoma domestic abuse conviction as a class A or B person misdemeanor. As anticipated, Moss contends that the district court improperly engaged in judicial factfinding about the Oklahoma domestic abuse conviction that went beyond identifying the statutory elements of that offense, thus violating his constitutional rights under *Descamps v. United States*, 570 U.S. __, 133 S. Ct. 2276, 186 L. Ed. 2d 438 (2013), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). We agree.

There is no need for us to conduct an in-depth analysis of the application of *Apprendi* and *Descamps* to sentencing in Kansas. Our court did so in *Dickey I*. Last year our Supreme Court did so again in its *Dickey II* decision. Those holdings apply here.

Under *Apprendi*, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. See also *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002).

As Moss correctly points out, "when a district court, for purposes of enhancing a defendant's sentence for a current conviction, makes findings of fact at sentencing that go beyond merely finding the existence of a prior conviction or the statutory elements that made up the prior conviction," *Apprendi* is implicated. See *Dickey II*, 301 Kan. at 1036 (citing *Descamps*, 133 S. Ct. at 2288-89). Under the analysis set forth in *Descamps*, which our Supreme Court adopted in *Dickey* II, a district court may use one of two approaches to determine whether a prior conviction may be used for sentencing purposes, *i.e.*, the categorical approach or the modified categorical approach. 301 Kan. at 1037 (citing *Descamps*, 133 S. Ct. at 2281-84, 2287).

24

A district court applies the categorical approach "when the statute forming the basis of the defendant's prior conviction contains a single set of elements constituting the crime." *Dickey II*, 301 Kan. at 1037. This approach involves making a comparison between the elements of the statute forming the basis of the defendant's prior conviction with the elements of any comparable Kansas law. If the elements of the prior crime are the same as or more narrow than the corresponding Kansas crime, the prior conviction may be used for sentence enhancement purposes. 301 Kan. at 1037, 1039.

The modified categorical approach, on the other hand, is applicable where "the statute forming the basis of the prior conviction is a 'divisible statute,' *i.e.*, a statute which includes multiple, alternative versions of the crime and at least one of the versions matches the elements" of the corresponding Kansas offense. *Dickey II*, 301 Kan. at 1037 (citing *Descamps*, 133 S. Ct. at 2281-82, 2284-86). When a defendant's prior conviction arises under a divisible statute, the district court cannot determine whether the defendant's prior conviction is comparable by merely examining the elements of the statute. 301 Kan. at 1037. Accordingly, "without running afoul of *Apprendi*, a [district] court is permitted to look beyond the elements of the statute and examine a limited class of documents," which includes charging documents, plea agreements, jury instructions, verdict forms, transcripts from plea colloquies, and findings of fact and conclusions of law from a bench trial, "to determine 'which of a statute's alternative elements formed the basis of the defendant's prior conviction.'" 301 Kan. at 1037-38 (citing *Descamps*, 133 S. Ct. at 2284; *Johnson v. United States*, 559 U.S. 133, 144, 130 S. Ct. 1265, 176 L. Ed. 2d 1 [2010]).

Here, as Moss contends, Lawton, Oklahoma, Municipal Code § 16-2-1-204 qualifies as a divisible statute because it includes multiple alternative ways to commit the crime of domestic abuse. It appears, assuming the ordinance in the record is consistent with the one under which Moss was convicted, that at least one of the subsections may well match the elements of the Kansas domestic battery statute. Thus, depending on the evidence, a *Descamps* modified categorical analysis might justify the treatment of the

25

Oklahoma conviction as an offense appropriate for conversion. But under the limited evidence made available to us, we just cannot rule out the possibility of error. As the district court acknowledged, it did not conduct a *Descamps* analysis before finding that the Oklahoma conviction could be used to enhance Moss' criminal history score. Its failure to conduct a *Descamps* analysis in light of the record on appeal was error.

Under these circumstances, we must vacate Moss' sentence and remand the matter to the district court for a proper *Apprendi/Descamps/Dickey II* analysis in order to determine the appropriate classification of Moss' domestic abuse conviction.

*The district court did not err when it instructed the jury that its verdict "must be founded entirely upon the evidence admitted and the law as given."*

Moss contends that the district court violated his constitutional right to a jury trial when it read the third sentence of PIK Crim. 4th 68.010 to the jury, which stated: "Your verdict must be founded entirely upon the evidence admitted and the law as given in these instructions." Moss complains, in essence, that the instruction improperly preempted jury nullification and compelled the jury to convict him. Specifically, he contends that "an instruction informing the jury it must follow the law as given is an incorrect statement of the law."

Moss concedes that he did not object to the instruction at trial. A party cannot claim error for the district court's giving or failing to give a jury instruction unless (1) the party objects before the jury retires, stating distinctly the matter to which the party objects and the grounds for the objection; or (2) the instruction or the failure to give the instruction is clearly erroneous. *State v. Smyser*, 297 Kan. 199, 204, 299 P.3d 309 (2013). Appellate courts utilize a two-step process in determining whether a challenged instruction was clearly erroneous: (1) The court must determine whether there was any error at all by considering whether the subject instruction was legally and factually

26

appropriate, employing an unlimited review of the entire record; and (2) if the court finds error, it must assess "'whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" 297 Kan. at 204. Reversibility is subject to unlimited review and is based on the entire record; the party claiming error in the instructions has the burden to prove the degree of prejudice necessary for reversal. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014).

Our appellate courts have consistently rejected similar jury nullification arguments advanced by defendants, regardless of which instruction they attack. Moss' current attack on PIK Crim. 4th 68.010 is likewise without merit. In *State v. McClanahan*, 212 Kan. 208, 510 P.2d 153 (1973), our Supreme Court recognized that the jury had the power to acquit even in the face of overwhelming evidence of guilt. But the *McClanahan* court concluded that it was legally inappropriate to provide a jury with the then available "do what you think is fair" instruction from PIK Crim. 51.03, because the "tenor of the instruction militate[d] against our generally accepted law as to the diverse functions of court and jury." 212 Kan. 208, Syl. ¶¶ 3-4, 215.

More recently, in *State v. Naputi*, 293 Kan. 55, 65-66, 260 P.3d 86 (2011), our Supreme Court determined that jurors should not be instructed on the power of nullification because "[i]t is not the role of the jury to rewrite clearly intended legislation, nor is it the role of the courts to instruct the jury that it may ignore the rule of law, no matter how draconian it might be." See also *Silvers v. State*, 38 Kan. App. 2d 886, 888, 173 P.3d 1167, *rev. denied* 286 Kan. 1180 (2008) (Jury nullification is "'[a] jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness.'").

Moss' argument that an instruction based on PIK Crim. 4th 68.010 misstates the law is not persuasive. Although Moss has that instruction as his particular target, we generally examine the "'jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury.'" *State v. Hilt*, 299 Kan. 176, 184-85, 322 P.3d 367 (2014) (quoting *State v. Williams*, 42 Kan. App. 2d 725, Syl. ¶ 1, 216 P.3d 707 [2009], *rev. denied* 290 Kan. 1104 [2010]).

The instruction Moss challenges, *i.e.*, "Your verdict must be founded entirely upon the evidence admitted and the law as given in these instructions" explicitly refers to other instructions. The district court also instructed Moss' jury that it was to "decide the case by applying these instructions *to the facts as you find them*." (Emphasis added.) Moreover, the district court informed the jurors that "if you have a *reasonable* doubt as to the truth of any of the claims required to be proved by the State *you must find the defendant not guilty*." (Emphasis added.) Finally, relevant here, the district court informed the jurors that, even if they had no reasonable doubt as to what the State was required to prove, "you *should* find the defendant guilty." (Emphasis added.)

Read together, the law as given in the instructions was correct and could not have prejudiced Moss. An examination of the record shows that Moss' trial counsel exploited Straws' antagonism for Muller:  Straws at least implied that Muller brought whatever happened to him on himself. Then, during closing argument, defense counsel disavowed any effort to persuade the jury to disregard the law. He then vigorously argued the discrepancies between the testimony of Muller and Straws, casting doubt on the credibility of each of them. Thus, counsel essentially encouraged the jurors during closing to set the reasonable doubt bar at its upper limit when determining whether the crimes charged had even occurred. While some observers might conclude that such an approach is tantamount to seeking nullification, it is actually consistent with the instruction Moss attacks. After all, Moss' jurors were instructed that they could decide

28

what to believe. If they had a doubt they determined to be reasonable as to proof of an element, they were required to acquit. And even if they had no such reasonable doubt, they were directed that they merely should convict.

The third sentence of PIK Crim. 4th 68.010 simply describes the jurors' legal duty to render a verdict according to the law in the instructions and the evidence as the jurors determine it to be. The instruction, especially in light of the others given, fairly states the law. It did not tell the jury, as Moss argues, that it "must" convict him, just that it must follow the law given in the instructions. The instruction is consistent with the statutory directive in K.S.A. 22-3403(3) which states: "When the trial is to a jury, questions of law shall be decided by the court and issues of fact shall be determined by the jury." It is also consistent with K.S.A. 2015 Supp. 60-247(d), which provides that "[t]he jurors must swear or affirm to try the case conscientiously and return a verdict according to the law and the evidence." As noted above, when read together with the other instructions given, the challenged instruction neither forbade nor promoted jury nullification. It did not violate Moss' constitutional right to a trial by jury. Because the instruction was not erroneous it could not be clearly erroneous.

We affirm Moss' convictions, but we vacate his sentence and remand the matter for further proceedings regarding his Oklahoma conviction consistent with *Apprendi*, *Descamps*, and *Dickey II*.