NOT DESIGNATED FOR PUBLICATION

No. 115,646

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ANDRE NIGEL KING,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; TIMOTHY P. MCCARTHY, judge. Opinion filed May 4, 2018. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., MALONE, J., and MERLIN G. WHEELER, District Judge, assigned.

PER CURIAM: Andre Nigel King brings this appeal of his conviction of aggravated kidnapping making three arguments. First, he complains that the district court erred in instructing the jury on the definition of "bodily harm" along with the elements of aggravated kidnapping. Secondly, he contends the district court erred in denying his motion for a new trial claiming ineffective assistance of trial counsel. Finally, he argues that if none of the individual errors warrant reversal, cumulative error requires reversal. Finding no error, we affirm.

1

*Facts*

The events occurring between King and his estranged wife, M.K., on May 3, 2014, resulted in the State charging King with one count of rape in violation of K.S.A. 2013 Supp. 21-5503, and one count of aggravated kidnapping in violation of K.S.A. 2013 Supp. 21-5408(b). The jury was unable to reach a verdict on the rape count but found King guilty of aggravated kidnapping.

In order to understand King's contentions, an extensive discussion of the events and the evidence is necessary. King was living at M.K.'s home, although they were separated. In the early morning hours of May 3, 2014, upon M.K.'s return home from work, King accused her of infidelity, calling her a "whore and a slut." M.K. tried to go to her bedroom, but King grabbed a knife and demanded that she talk to him. She testified he held the knife to her chest, inducing fear.

As she tried to escape, M.K. testified that King grabbed her hair and pulled her up the stairs into the bathroom. Her testimony was she fought by kicking and screaming and once in the bathroom, King continued to hold the knife to her chest. M.K. further explained that King wanted to see her cell phone for evidence of her contacts with other men. He walked her to another room with the knife held to her back. The other room was where M.K.'s six-year-old son, J.K., was sleeping. Upon retrieving the cellphone, M.K. was forced back to her bedroom where King discovered contact with other men and began punching her with a closed fist to the top of her head. He strangled her to the point it was difficult to breathe and she thought she would die. During this time, M.K. explained that King called her a "nasty whore" and made statements such as he "wished he never had kids with [her, and] wished he never would have married [her]."

2

M.K.'s description of the violence by King included three occasions where he shoved his fist up her vagina while opening his hand and trying to rip her insides out. She claimed that the pain was worse than childbirth.

M.K. testified that King continued his search of her cell phone, calling her names, and hitting her for about three hours, during which time he was sitting on top of her. Eventually, King told her to get up and get out of his sight, as he was done with her. She was allowed to leave the bathroom at nearly 5 a.m. and went to her bedroom.

M.K. testified that at 6 a.m., her nursing school class was to begin and she decided to go to class rather than to the police station or hospital. After her class ended at 4 p.m., M.K. went to the police station accompanied by a friend, Julie Moss, who she had called for support. She explained that after describing King's acts, police took her to the hospital where she was admitted because the swelling to her neck raised concerns about her ability to breathe.

During the trial, M.K. identified several photographs of herself. These photos show scratches and bruises on her head, chest, back, arms, and lower left abdomen, which she testified were caused by King. Six of the scratches were from the knife King used to poke her.

M.K.'s examination at trial also included questions about why she did not immediately seek police or hospital assistance. She testified that she did not know if she wanted to go to the hospital or police because King was her husband, she still loved him, and she did not want to get him into trouble. She said that she was testifying reluctantly and wished the State would not prosecute King, hoping that he could get therapy as opposed to prison because he was a good father.

Jennifer Johnson, a nurse practitioner specializing in sexual assault forensic examinations, examined M.K. Johnson described visible swelling to the outside of M.K.'s throat, bruising and abrasions on M.K.'s face, neck, chest, back, arms, and lower abdomen. During the exam, Johnson took photos of M.K.'s body, including her genitals. Johnson's opinion was that the observed trauma was consistent with M.K.'s disclosure about King forcing his fist into her vagina. Several of the photos Johnson took of M.K.'s genitals were admitted into evidence through Johnson's testimony. During cross-examination by King's attorney, William Dunn, Johnson was asked if she observed any injury to M.K.'s clitoris, to which Johnson responded that she did not. Dunn also inquired if Johnson noticed whether M.K. had any piercings, to which Johnson responded that she did not. The photos taken by Johnson did not depict M.K.'s clitoris.

Police found a knife on a cutting board in the kitchen which was identified by M.K. as the knife used by King. A forensic scientist testified the knife had a red-brown stain determined to be blood, and the DNA within this blood belonged to M.K. The scientist described that there was a 1 in 14.71 sextillion chance of error in this analysis. There was no DNA belonging to M.K. in King's fingernail scrapings or on his right hand. No conclusive finding could be made regarding whether the DNA on King's left hand belonged to M.K.

King's case-in-chief consisted of calling two gynecologists who opined that after examining the photographs of M.K.'s genitalia, they did not believe King had forced his fist into her vagina. Both concluded that such an act would cause more physical trauma to M.K.'s vagina than was evidenced in Johnson's photographs. Johnson was also recalled and asked if her opinion about M.K.'s injuries had changed after hearing the gynecologists' testimony. Johnson testified that she believed the gynecologists' opinions were incorrect.

During the jury instruction conference, the State requested that the term "bodily harm" be defined along with the elements of aggravated kidnapping. The definition was: "'Bodily harm' is defined as any touching of the victim against the victim's will; with physical force, in an intentional, hostile, and aggravated manner." King objected to the request, arguing that the determination of the meaning of bodily harm should be left to the jury. In its response, the State pointed out that there was a dispute regarding the existence of bodily harm and the notes to PIK Crim. 4th 54.220 suggested that the definition of bodily harm be given where there was a factual dispute concerning the existence of bodily harm. The district court granted the State's request for the definition of bodily harm over King's objection.

The jury found King guilty of aggravated kidnapping but was unable to reach a verdict on the rape count.

Subsequent to the trial, King obtained new counsel—Stacy Schlimmer. King timely filed a motion for a new trial 13 days after his conviction alleging ineffective assistance of trial counsel—William Dunn. King's motion alleged insufficient assistance because of the failure to call three witnesses: Detective Brett Hays, Moss, and J.K. King also asserted that Dunn was ineffective because of his failure to investigate whether Johnson's photographs of M.K.'s genitals were actually M.K.'s genitals. King's premise was that the photographs admitted could not have been of M.K. because she had a clitoris piercing and it was not present in the photographs admitted.

At the hearing on King's new trial motion, Dunn and M.K. testified. Dunn testified King had a calm and collected manner during his interview at the police station. Dunn added that Hays could also testify as to the lack of King's physical injuries. Dunn also testified that he could have successfully cross-examined Hays if he appeared in the State's case-in-chief, but tempered this statement with the conclusion that Detective Hays "might have hurt" King had he testified.

5

Dunn's explanation for not calling J.K. was based, in part, on his young age. Further, Dunn feared that calling J.K. would open the door to the admission of J.K.'s interview at Sunflower House in which he validated some of M.K.'s account of the events.

Dunn also testified that he intentionally did not call M.K.'s 15-year old son, N.S. He was in the basement during the incident. Dunn testified that his decision was purposeful because he believed the potential benefit was outweighed by the potential risks of the testimony. Dunn also believed the fact that N.S. did not testify could be blamed on the State.

When describing his reason for not calling Moss, Dunn believed her testimony might hurt King after he watched the video of Moss and M.K.'s interaction at the police station. He explained that their interactions did not look rehearsed. Dunn was aware that Moss could have testified about "pull[ing] a very similar scheme against her husband who was in jail awaiting trial on similar kind of charges."

Dunn's decisions regarding the photographs of M.K.'s genitals were also called into question during the new trial hearing. Dunn believed that King had seen all of the photos before trial. Dunn also testified that he did not usually cross-examine someone on whether they have the proper pictures of genitalia and he did not doubt that Johnson's photos were of M.K.'s genitalia. Dunn tempered this statement with the comment that "in retrospect, something occurred." Dunn clarified this by noting that when reviewing the photos with King, King asked him a couple of times, "Where is her clit ring?" Dunn did not then understand what King was trying to convey but later came to the conclusion that King was saying the photographs could not be of M.K. because of the absence of the piercing. Dunn concluded that if he had asked M.K. if she had a clitoris piercing and she had said no, he would have asked for a mistrial.

6

M.K. then testified as to her recent review of the photographs taken by Johnson and admitted into evidence. M.K. stated that she has had the piercing for three to four years and has never taken it out, even during Johnson's sexual assault examination. Although admitting on cross-examination that her clitoris was not shown in any of Johnson's photos, she did not believe the photos were of her because she had a piercing.

King's motion for a new trial was denied. In doing so, the district court expressed his belief that the jury's failure to reach a verdict on the rape charge was due to the testimony of the two gynecologists called by King. The district court also found that Dunn had explained his failure to call Detective Hays, Moss, J.K., and N.S. due to the risk of hurting King's defense. In ruling on the argument about the alleged discrepancies in the photos, the district court found "there was testimony and evidence available for that" and concluded that he did not believe that King's case would have changed had Dunn called the witnesses. Finally, the district court opined that a new trial was not warranted in the interests of justice. King was then sentenced to 240 months in prison, followed by 36 months' postrelease supervision for the aggravated kidnapping conviction.

*Did the district court err in instructing the jury?*

King argues that the district court's inclusion of the instruction defining bodily harm was error. The definition given by the district court was approved by our Supreme Court in *State v. Royal*, 234 Kan. 218, Syl. ¶ 6, 670 P.2d 1337 (1983). King does not allege any error in the substance of the definition, claiming only that it should not have been given. His argument essentially is that the notes to PIK Crim. 4th 55.220 are in error insofar as the notes conclude that the decision in *State v. Peltier*, 249 Kan. 415, 819 P.2d 628 (1991), supports the proposition that the definition of the term bodily harm should be given if there is an issue as to the existence of bodily harm. King further suggests that the decision in *State v. Brice*, 276 Kan. 758, 80 P.3d 1113 (2003), disapproved of giving this definition to a jury.

Our Supreme Court in *State v. McDaniel*, 306 Kan. 595, 614, 395 P.3d 429 (2017), directed a three-step process for reviewing jury instruction issues:

(1)     A determination whether the appellate court can or should review the issue, i.e., whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal;

(2)     consideration of the merits to determine whether error occurred; and

(3)     assess whether the error requires reversal.

The question of whether a party has preserved the jury instruction issue affects the reversibility inquiry of the third step.

Turning to the first prong of the *McDaniel* process, we note that King did object to the giving of the bodily harm definition by the trial court. The State does not challenge that King has preserved this issue for appeal. Therefore, we conclude that King has preserved the issue for appeal and it is properly before the court for review.

The second step in analysis of claimed instructural error requires us to determine whether the instruction was both legally and factually appropriate. *McDaniel*, 306 Kan. at 614. King has not, in his written or oral arguments, questioned the factual appropriateness of the definition. Moreover, King's opening remarks at trial questioned whether M.K.'s injuries were caused by him, or if the marks on her back were simply acne. His witnesses also disputed whether the injuries supported M.K.'s claim that King thrust his fist into her vagina, further demonstrating that bodily harm was raised by King.

While it was apparent that the existence of bodily harm was disputed at trial, King's arguments upon appeal regarding why the instruction should not have been given are purely legal in nature. In plain language, he has not challenged on appeal whether the instruction was factually appropriate. Thus, King has abandoned any arguments he may

8

have had regarding the factual appropriateness of the instruction. See *State v. Williams*, 303 Kan. 750, 758, 368 P.3d 1065 (2016).

Turning to the question of the legal appropriateness of the instruction, the record reflects that the district court instructed the jury that one of the elements of aggravated kidnapping required the State to prove that bodily harm was inflicted on M.K. In addition, the district court gave the instruction defining bodily harm in the following manner: "'Bodily harm' is defined as any touching of the victim against the victim's will; with physical force, in an intentional, hostile, and aggravated manner." This language comes directly from *Royal*, 234 Kan. 218, Syl. ¶ 6, which is cited in the notes to PIK Crim. 4th 54.220 used by the district court as the pattern for its aggravated kidnapping instruction. Moreover, these notes also point out that the trial court "should" instruct a jury on the definition of bodily harm if there is an issue of fact as to whether bodily harm occurred.

King contends that the PIK notes are erroneous and by extension, the district court, by relying on those notes, has misapplied Kansas law. King relies on three arguments to support his challenge. These arguments involve the interpretation of the decisions in *Royal*, *Peltier*, and *Brice*. We first review what those cases held.

In *Royal*, the appellant argued that it was error for the district court to not give an instruction defining bodily harm in addition to the elements for the aggravated kidnapping charge. Rejecting this argument, our Supreme Court made two holdings. First, it adopted language previously approved in *State v. Taylor*, 217 Kan. 706, 713-15, 538 P.2d 1375 (1975), as the definition of bodily harm. This definition was used by the district court in King's trial. Second, the *Royal* court explained that ordinarily a definition of the term bodily harm in an aggravated kidnapping case is not necessary because the term is understandable, and that bodily harm was present in *Royal* because the victim sustained multiple injuries; i.e., there was no factual dispute. Thus, the Supreme Court

9

held the district court had no duty to give the bodily harm definitional instruction. However, citing PIK Crim. 2d 56.25, the Supreme Court cautioned that where there is a fact issue as to whether bodily harm is sustained, the matter may be submitted to the jury with a proper instruction. 234 Kan. at 223.

King asserts that the definitional instruction should not have been given because the cautionary phrase noted by the Supreme Court in *Royal* is not entirely clear. King suggests the lack of clarity stems from the holding in *Royal* that no definitional instruction is ordinarily necessary.

King's argument fails because the *Royal* court specifically recognized that in some circumstances a definitional instruction of bodily harm would be necessary. By holding that "if there is a fact issue as to whether bodily harm is sustained by a victim, the matter may be submitted to the jury under proper instructions" the Supreme Court did not create any ambiguity in its holding. 234 Kan. at 223. This is because by using the word "ordinarily," it is readily apparent that the *Royal* court recognized that in those cases where bodily harm is in dispute, an instructional definition would be necessary.

King's second argument regarding the legal appropriateness of the challenged instruction involves an interpretation of *Brice*, 276 Kan. 758. King asserts that *Brice* disapproves of providing a bodily harm definition.

*Brice* held that the district court erred when it instructed the jury that the definition of "bodily harm" was a "through and through bullet wound." In so holding, the Supreme Court explained that the trial court's instruction led the jury to conclude that an element of the crime had been proven. Thus, it concluded that in effect, the trial court had erroneously directed the verdict on an essential element of the crime. 276 Kan. at 771.

10

King's reliance upon *Brice* is flawed because unlike the erroneous instruction in *Brice*, the instruction here did not create a definition that explicitly stated the injury constituted bodily harm. Thus, the district court's instruction did not remove an element of the crime from consideration by the jury as did the instruction in *Brice*.

King finally relies on *Peltier*, where the jury was instructed that "'indecent liberties with a child constitutes "bodily harm" as used in [the aggravated kidnapping] instruction.'" 249 Kan. at 424. Peltier argued that giving this definition was error because the existence of bodily harm was a question of fact for the jury to determine and the State should be required to prove that element beyond a reasonable doubt. In finding the district court erred because it did not provide the jury with the definition of bodily harm as set out in *Royal*, our Supreme Court specifically referred to the district court's failure to follow the Pattern Instruction Committee's suggestion in the Notes on Use to the aggravated kidnapping charge and let the jury decide whether the evidence established bodily harm. 249 Kan. at 426. Thus, like in *Brice*, the trial court erroneously took the question away from the jury which distinguishes *Peltier* from the present case.

King's argument regarding *Peltier* is somewhat unclear. He takes issue with the district court's reliance on the PIK notes, citing *Royal* and *Peltier*, which suggests that the definition of bodily harm should be given when there is a factual dispute. King's argument implies that the notes to PIK Crim. 4th 54.220 are incorrect because *Peltier* never held that if there was an issue of fact as to whether bodily harm occurred, the jury instruction should include the definition of bodily harm. Instead, King suggests that *Peltier* merely made that "suggestion." This argument does not withstand scrutiny because *Royal* clearly held that district courts may provide the definitional instruction in aggravated kidnapping cases when the existence of bodily harm is in dispute. *Peltier* merely reaffirmed *Royal* and further extended the holding by concluding that district courts may and should give the definitional instruction when there are factual disputes. 249 Kan. at 424. As a result, King's assertion that the giving of the definitional

11

instruction is a mere suggestion is simply not supported by an accurate reading of caselaw.

The error in King's analysis is further illustrated by the holding of this court in *State v. Moss*, No. 113,034, 2016 WL 3856824, at *13 (Kan. App. 2016) (unpublished opinion). In *Moss*, this court construed *Peltier* as being a clear indication by the Supreme Court that if the existence of bodily harm is in dispute, the instruction should include a definition of bodily harm.

Keeping in mind that King has not challenged the bodily harm definitional instruction as factually appropriate, it is readily apparent that there was a factual dispute regarding the existence of bodily harm. The testimony of two gynecologists offered by King that M.K.'s injuries did not support the conclusion that King repeatedly inserted his fist in her vagina clearly illustrate the nature and extent of that factual dispute.

Although King's reliance on *Royal*, *Peltier*, and *Brice* is misplaced, King additionally attacks the bodily harm definitional instruction by suggesting that the Supreme Court's holding in *Brice* demonstrates it is moving away from the holdings of *Royal* and *Peltier*. Our readings of the holdings of these three cases does not coincide with that of King and we find nothing about the holdings of those three cases that are inconsistent or evidence a change of approach by the Supreme Court. In the absence of an indication that our Supreme Court has changed its view on a prior ruling, we are duty bound to follow the holdings of these three cases. See *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015).

In *State v. Robinson*, 306 Kan. 1012, 399 P.3d 194 (2017), the Supreme Court has also rejected King's claim. In Robinson's appeal of his aggravated battery conviction, he relied on *Brice* and argued the bodily harm definitional instruction given by the district court had instructed the jury, as a matter of law, that bodily harm existed. In rejecting this

12

argument, the Supreme Court specifically noted the district court did not include the facts of the case into the bodily harm instruction and found the instruction given fairly and accurately stated the applicable law. *Robinson*, 306 Kan. at 1028. Thus, unlike *Brice*, the instruction did not explicitly state that the injury the victim suffered constituted bodily harm.

King has essentially made the same argument as *Robinson*, but the facts of this case do not compel an outcome different from *Robinson*. The district court's definition of bodily harm essentially mirrored that approved by the Supreme Court in *Royal*. Consequently, the *Robinson* court's analysis, even though not involving a challenge to an aggravated kidnapping conviction, is clearly an indication that the Supreme Court approves of the instruction in factually appropriate circumstances, thus continuing to undermine King's arguments regarding the ambiguity of *Royal*, *Peltier*, and *Brice*.

Because there is no error in giving the instruction challenged in this case, we need not consider whether the giving of the instruction resulted in harm.

*Did the district court err in denying King's motion for a new trial?*

Prior to consideration of the substantive issues raised in King's motion for a new trial, a procedural issue needs to be briefly addressed. Although the record indicates King's substitute counsel did not include any claim of ineffectiveness of trial counsel in his first motion for a new trial and failed to obtain leave to amend to include the claim, the parties and the district court proceeded to the hearing on the motion as though those claims were properly before the court. Thus, even though the procedures to obtain a new trial under K.S.A. 2014 Supp. 22-3501 were not complied with, the district court heard evidence, considered, and denied King's claims of ineffective assistance of counsel.

13

King argues for the first time on appeal that his counsel failed to call N.S. as a witness. Admittedly, during the hearing, King's substitute counsel asked Dunn why he did not call N.S. as a witness, but the record is devoid of any argument that Dunn was ineffective in failing to call N.S. as a witness.

In *State v. Reed*, 302 Kan. 227, 233, 352 P.3d 530 (2015), our Supreme Court addressed procedures when claims of ineffective assistance are brought in untimely motions for a new trial. The court observed that

> ""there are circumstances when no evidentiary record need be established, when the merit or lack of merit of an ineffectiveness claim about trial counsel is obvious," and an ineffectiveness claim can therefore be resolved' by an appellate court." 302 Kan. at 234.

The *Reed* court explained that the filing of ineffective assistance claims in an untimely motion for a new trial is a procedural flaw, but not a jurisdictional bar. 302 Kan. at 235. The court then addressed the merit of Reed's ineffective assistance claims because it had the advantage of the full transcript of the evidentiary hearing in the record on appeal.

The situation before this court is nearly identical to that in *Reed*. Thus, regardless of any procedural flaws, nothing prevents this court from considering King's claims since it has the benefit of a full evidentiary hearing on the record to enable it to address King's claims. We therefore conclude that, rather than have King repeat his claims in a K.S.A. 60-1507 motion in the future, consideration of judicial economy directs addressing the ineffectiveness of assistance claims presently.

Ordinarily, appellate courts review the district court's denial of a new trial motion for an abuse of discretion. However, because this court has chosen to review King's

claims for the reasons set forth in *Reed*, the standards for review applicable to appeals from denial of a new trial motion are inapplicable.

Challenges involving ineffective assistance of counsel present mixed questions of fact and law. When the district court holds a full evidentiary hearing as the district court did in this case, appellate courts review the district court's factual findings to determine if those findings are supported by substantial competent evidence. Appellate courts review de novo the district court's legal conclusion regarding whether counsel provided deficient performance. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015).

For guidance in applying these standards, we look to *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014). This case requires that a defendant seeking to establish ineffective assistance of counsel must prove that:

- counsel's performance was deficient under the totality of the circumstances; and
- prejudice resulted from counsel's deficient performance. In doing so, the defendant must demonstrate that but for counsel's deficient performance, there was a reasonable probability the jury would have reached a different result.

In addressing this task, the reviewing court strongly presumes that counsel's performance fell within the broad range of reasonableness, meaning that judicial scrutiny of counsel's performance is highly deferential. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014).

King's arguments in support of a new trial are premised upon a claim that Dunn was ineffective in the following respects:

- By failing to call four witnesses—Detective Hays, Moss, J.K., and N.S.;

15

- failing to object to the admission of photographs taken of M.K. "that later were shown to not depict her."

He further argued that the district court erred by emphasizing Dunn's positive efforts toward representation instead of addressing how Dunn's failures damaged his defense. He then concluded that Dunn's deficient performance resulted in prejudice, entitling him to a new trial on his aggravated kidnapping conviction.

The State responded that King ignored that Dunn's testimony reflected that he made strategic decisions not to call the witnesses. The State also argued that many of the statements made by Dunn at the motion for a new trial relied upon by King were made in hindsight and not as significant as asserted by King. Finally, the State asserted that even if Dunn's performance fell below an objective standard of reasonableness, King suffered no prejudice as a result of Dunn's performance.

A review of each of King's claimed errors does not support the conclusion he seeks. Illustrative of this conclusion is our analysis of King's claim that Detective Hays should have been subpoenaed and his testimony presented by Dunn. King points to a single portion of Dunn's testimony that he did not have a good explanation for failure to subpoena Detective Hays. He goes on to claim that Hays *could* have testified about King's calm demeanor and lack of physical injuries during Hays' initial interview of King. King claims Dunn had planned to address these positive facts during cross-examination, but since Hays was not called by the State and Dunn did not subpoena Hays, the jury was not informed of these positive acts.

However, King's argument fails to account for Dunn's other testimony that supported Dunn's conclusion that he did not believe Hays would be a good witness. Dunn's testimony at the new trial hearing was clearly supportive of King's efforts and while some of his answers may have been considered concessions of ineffectiveness,

16

there were certainly explanations given for Dunn's failure to call these witnesses. For example, after conceding he had failed to subpoena Hays, Dunn also conceded that there were things that Hays could testify about that might have been contrary to King's interests. Dunn concluded that if Hays did not show up, it was good for the defense and there was a strategic reason not to call Hays.

Strategic decisions made after investigation of the law, facts, and available options are virtually unchallengeable. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013). Here, there is no evidence to suggest Dunn failed to make a thorough investigation of Detective Hays' testimony. Further, despite Dunn's obvious self-contradictory testimony offered in an attempt to aid King, he did not object to the prosecutor's assertion that King made incriminatory statements during his interview with Hays. Dunn also conceded that he was also concerned about Hays testifying about his investigation of M.K.'s phone calls because it would confirm that M.K. had called someone immediately following the events and that something had happened. Furthermore, Dunn never concluded that he should have called Hays.

Dunn's testimony would, at best, be a claim that in hindsight he might have done something differently. Unfortunately for King, it is insufficient to surmise, with the benefit of hindsight, that another attorney might have tried the case differently. See *Harris v. State*, 288 Kan. 414, 416, 204 P.3d 557 (2009).

King's argument also confuses the difference between subpoenaing and actually calling Hays and assumes that by subpoenaing Hays, Dunn would necessarily have called him. Since there appears to be a consistent explanation supporting the decision not to call Hays, the decision not to subpoena him is irrelevant.

The next argument advanced by King involves potential witnesses J.K. and N.S. Dunn had chosen not to subpoena or call either—a decision King claims was based upon

17

speculation as to the risk of calling a young child as a witness and not a strategic decision. We conclude that King's assessment is incorrect.

Dunn testified he did not call J.K. because of the risk that it would permit the State to admit the video of J.K.'s Sunflower House interview. Although Dunn appeared reluctant to directly respond to inquiries about the contents of the Sunflower House video, he conceded there were things in the video that were "going to hurt us" if presented to the jury. These included statements by J.K. that his mom was sad and crying the night of the incident and that she cried out for his older brother to call the police. J.K. was also shown in the video as saying that "it was a good thing that Dad was gone because now his mom doesn't get hurt anymore." Dunn admitted these statements scared him out of using the video. A conscious conclusion about the effect of admission of the video's contents is undoubtedly a well-grounded strategic decision that should not be second-guessed by this court.

Dunn's decision-making on a strategic basis is further illustrated by the decision not to call N.S. His information was that N.S. was in his bedroom in the basement of the residence during the incident between King and M.K. This information included that N.S. was playing video games and did not hear anything. Dunn did not believe this information, but expressed fear that a jury would accept N.S.'s statement as to why he was not aware of the incident. Dunn was also aware of N.S.'s description of King as disrespectful to his mom, that he called her names, and he called her a bitch frequently. Recognizing King's history of domestic violence, Dunn concluded the possible value of N.S.'s testimony was overshadowed by the possible damage. Buttressing this conclusion was Dunn's explanation that he could blame N.S.'s absence at trial on the State. His argument then became that although the State had the burden of proof, it failed to call witnesses who were in the house during the incident. A review of the closing arguments of the trial demonstrates Dunn's use of this tactic, not only as to N.S.'s testimony, but also as to the failure of the State to call Detective Hays, Moss, and J.K.

18

After examining King's argument, we find no basis to conclude that Dunn's failure to subpoena or call J.K. and N.S. was based upon anything other than a thorough investigation in calculation of the risks involved. This is particularly true when we specifically note that King offered no evidence regarding anything beneficial that either J.K. or N.S. could have offered in support of his defense. In plain language, King has not explained what J.K. or N.S. would have testified to that could have helped him. Given that the record only supports Dunn's conclusion that the testimony of J.K. and N.S. could have harmed the defense, King's conclusion that Dunn was ineffective for failure to subpoena and call these witnesses is without merit.

Dunn's testimony that he thought Moss might hurt his defense but never interviewed her, and he did not know if he had a specific reason for not calling Moss, forms the basis for King's assertion that Dunn was ineffective.

While it is apparent that Dunn was sympathetic to King's attempt to secure a new trial and either could not or would not articulate a reason for not interviewing, subpoenaing, or calling Moss, his testimony regarding the video of Moss demonstrates adequate reasoning and strategy for his decisions regarding use of Moss as a witness. This is illustrated by his responses that he had seen a video of her at the police station with M.K. and felt that she might have hurt King's defense.

Dunn described the video of Moss and M.K. at the police station just before M.K. had reported the events to the police. He articulated that the interaction between Moss and M.K. made him hesitant to call her as a witness based upon a belief that the video would have evoked a lot of sympathy towards M.K. and particularly that the hugging between M.K. and Moss did not appear to be rehearsed and would not have looked good for King. Dunn concluded that his view of the genuine interaction between M.K. and Moss would make M.K.'s explanation more credible. Thus, while Dunn did not interview

19

Moss, the existence of very definite and articulable reasons for not subpoenaing or calling her are apparent.

King has, like his arguments concerning J.K. and N.S., not articulated or even attempted to explain how calling Moss would have benefitted his defense. Given this failure, it is impossible to determine that Dunn's failure to interview or call Moss would have had an impact on the outcome of the trial. Therefore, Dunn's strategic decision, clearly supported by his view of the video evidence, falls squarely within the protection of the highly deferential presumption that he provided effective assistance to King.

King concludes his articulation of Dunn's alleged deficient performance by suggesting that Dunn failed to object when the prosecution sought admission of photographs of M.K. and failed to cross-examine either M.K. or Johnson about whether the photos could be of someone else. The photos are of the female genitalia and King contends they were not M.K.'s genitals because she had a piercing. His argument continues that since Dunn admitted King told him about this discrepancy at trial, Dunn's decision to not cross-examine either witness about the "glaring discrepancy" cannot be considered to be trial strategy.

King's argument fails for multiple reasons. First, since adequate foundation was established by the State for admission of the photographs through Johnson's testimony, he fails to demonstrate why the photographs would have been denied admission even if Dunn objected. Secondly, King only assumes that he established at the new trial motion that Johnson's photographs did not depict M.K.'s genitals. However, the only evidence about either the existence of the piercing or whether the photos depicted her genitals comes from M.K. Other than offering her own statement that she had examined the photos and did not believe the pictures were of her, King offered nothing to establish the photos were of anyone else. This hindsight testimony, standing alone, is simply not enough to overturn a question involving physical evidence admitted at trial, which

20

evidence included Johnson's testimony that the photos she took were of M.K. A party claiming error must designate a record establishing that error or the claim will fail. See *State v. Sisson*, 302 Kan. 123, 128, 351 P.3d 1235 (2015). The failure to include in the record any evidence to support King's misidentification claim or that admission of the photos would have been denied is fatal to this appeal.

Third, even if one disregards the preceding conclusions, King's argument ignores the fact that none of Johnson's photos contained any images of a clitoris. During the new trial motion, King admitted all of Johnson's photos, including those not admitted at trial. However, despite showing a cervix, vaginal canal, and closeups of the lower labia and hymen, there are no photos of a clitoris. Consequently, King cannot ignore the conclusion that his basis for believing the photos were not of M.K. is without any foundation.

Further, given that the photos also included views of M.K.'s face, body, and hospital identification bracelet, it is exceedingly improbable that a portion of the photos would accurately depict M.K. but other photos would not.

Finally, Given Johnson's identification of all photos admitted as being those taken by her of M.K., it is highly unlikely that cross-examining Johnson would have resulted in any different outcome other than simply buttressing the State's offer of admission. Thus, we find no deficiency of performance by Dunn in regard to the photographs.

Even if we were to assume Dunn was ineffective, relief would remain unavailable to King because he has failed to establish the second prong of the *Strickland* and *Sola-Morales* analysis, i.e., that prejudice resulted from counsel's deficient performance. Stated alternatively, King has not shown there was a reasonable probability that the jury would have reached a different result but for the deficient performance of counsel.

21

Dunn's testimony at the new trial motion hearing suggested that by calling the witnesses J.K., N.S., Moss, and Hays, the jury might have learned that:

- King had a calm and collected demeanor during his interview with Detective Hays;
- King did not appear to have any physical injuries during his interview with Detective Hays;
- N.S. was in the house and did not hear any fighting; and
- Moss had pulled a similar scheme against her then-husband who was in jail awaiting trial on similar charges.

Our analysis of the potential negative risks associated with any testimony by these witnesses results, as previously noted, in the conclusion that Dunn's strategic decision to not call these witnesses took into account that the potential benefit was outweighed by the known risk of calling the witnesses.

For example, Detective Hays could have impaired King's defense because it would have given the State an opportunity to highlight incriminatory statements by King in the interview. Similarly, the Sunflower House video interview of J.K. would have confirmed many aspects of M.K.'s story. N.S.'s potential testimony about the abusive nature of King's and M.K.'s relationship and that he did not hear any altercation because he was playing video games also outweighed any potential benefit of his testimony. Finally, not offering Moss' testimony avoided the risk of the defense witness creating more sympathy for M.K.

King further argues that the State's aggravated kidnapping case was weak and therefore the beneficial evidence potentially available from the testimony of these four witnesses was sufficiently important to establish prejudice. In doing so, he also suggests that because Johnson's photos allegedly had depicted someone else's genitals, her entire

22

testimony would have been undermined. These arguments regarding the prejudice prong of our analysis, like other arguments addressed in this opinion, ignores other evidence at trial which included:

- M.K.'s examination of Johnson's photos of the scratches, bruises on her head, chest, back, arms, and lower abdomen and her explanation of which body part was depicted in each photo;
- M.K.'s testimony identifying King as the person who inflicted her injuries; and
- the fact that many of the photos showed M.K.'s face, the result of which eliminated any concern that Johnson had incorrect photos.

Based upon this evidence, it appears there was ample support for the aggravated kidnapping conviction. Moreover, had the testimony of Hays, Moss, J.K., and N.S. been elicited, the opportunity for additional incriminating evidence being offered to the jury was ample.

Although we have examined King's claims at length from the perspective of whether Dunn's performance fell below acceptable standards, we also believe it is important to briefly address another reason why King's prejudice claim should not be considered. His entire prejudice argument hinges on the belief that if Dunn had subpoenaed these four witnesses, it would have allowed the jury to see even more credibility issues that could very likely have resulted in a different verdict. However, beyond this conclusory statement, we were not made aware of what credibility issues King believes actually existed. By failing to explain, even remotely, what kinds of credibility issues would have arisen from the inclusion of the testimony of these four witnesses, King has abandoned this argument. See *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015).

23

This failure is further compounded by the fact that King has not made an effort to explain what the testimony of J.K., N.S., and Moss would have been and how it could have positively affected his defense. A failure to explain why Dunn's decision to not call these individuals prejudiced King's defense is again abandonment of the argument. As a result, his prejudice claim fails.

*Cumulative error*

King's final argument is that even if none of the errors he asserted are found to constitute reversible error, the cumulative effect of the errors denied him a fair trial. Cumulative error occurs when the record reveals that the defendant's right to a fair trial was prejudiced based upon the errors at his or her trial when viewed in light of the record as a whole. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). To have a successful claim of cumulative error, however, this court must first find multiple errors. A claim of cumulative error cannot succeed if an appellate court has found either no or only one trial error. *State v. Williams*, 299 Kan. 509, 566, 324 P.3d 1078 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). As previously explained, King has failed to establish any trial errors. Accordingly, his claim of cumulative error necessarily fails.

The decision of the district court is affirmed.